United States v. Fumano. Good morning, may it please the court, United States attorneys, we respectfully, I represent Zion v. Fumano in his appeal of his sentence. I respectfully submit that a remand for resentencing is necessary and compelled here because of the errors in sentencing below. Right now the government concedes at least it has to be remanded, vacated and remanded with respect to the forfeiture, but you're asking for a broader remand. That's right. And even as to forfeiture, I would disagree with the government. So I need not spend time, I think that's clear from the briefs. So let me go to some of the sentencing errors that I do believe do require remand. So it's remand for restitution in the sentencing. Let's go to the sentencing first. The errors that I think are really clear here is the enhancements for the abuse of trust, 3B1.3 of the guidelines. The abuse of trust, if you read the guideline, is really a defendant, a personal activity, what you do, not a co-conspirator. So it's something you must do. And what the record is very clear here is that Fiumama, even according to the government and the record, was a sales manager. He didn't speak to the consumers. But didn't he supervise what the people who did speak to the consumers had to say? Yes. That's the record. I can't deny that because the record's clear. But I do believe, based on the case law, and I believe I cited a Third Circuit case from there, that says it can't be a co-conspirator's activity, it has to be what you do directly. Why would that be? This has to be judged from the perspective of the victim, right? That is correct. That's one of the projects. If the victim was given the impression that the folks that he was hiring were lawyers or were working on behalf of a law firm, would you agree that the law firmness would make that a position of trust? I do believe if somebody says, I'm a law firm, or I'm looking at your paper, that that would suggest that they have a level of trust, but— So your point is that Fiumano himself never made that representation? That's right. To the consumer. And— But why would that matter if he directed others to make that representation? Because the guidelines direct the activity to the individual, the offender, the defendant, so that— What's confusing is this is not a co-conspirator who did something completely different in the conspiracy. This is someone who is an aider and a better in the sense that he directed. It's not simply that he assisted. He directed the abuse of a position of trust. And in that sense, I would think that he's as responsible under the guidelines as the person who executes his direction. Well, Your Honor, that well may be an interpretation that the government gives the guidelines. I just simply say that if you look at the guidelines, that analysis just doesn't hold. Now, maybe we need an amendment to the guidelines, but what the guidelines specifically says and what our case law says, it's a two-prong analysis, whether the defendant occupied a position of trust from the victim's perspective, but it's the defendant that none of the people, the witnesses, at a minimum, said that they even spoke to him, knew of his name, nonetheless. Does that mean that no one except the person who is on the telephone is responsible for impersonating lawyers when the entire scheme was designed to impersonate lawyers? That's what was fraudulent about it? Well, they didn't impersonate lawyers. Well, I understand, but essentially gave the impression that they were acting on behalf of a law firm. Well, they gave the impression that they were reviewing files and that an attorney would be reviewing it. An attorney didn't review it for that purpose. From the perspective of the victim, I think we agreed that the victim was under the impression that he was, he or she, was speaking to someone acting on behalf of lawyers. Well, I don't think that that's... I mean, some of the victims testified to that, didn't they? No, I think that I would say that some of the witnesses testified, but the scripts that were admitted into evidence wouldn't support that. But that's... We don't dispute, because we're not disputing the conviction, that there were misrepresentations. The misrepresentation was that they were reviewing them and that an attorney... Not that the person on the other end of the phone was the actual attorney. But I did want to point out that this is two-pronged and that there is case law that supports my position. This would have to be plain error, would it not? Well, that's somewhat tricky in this case, and I'm going to tell you why. What the below, the attorney below, did raise in his sentencing brief a contention that this guideline should not apply and talked about the role. Well, if the role was a sales manager, then I would suggest, and that's what he talks about in his brief, that that's enough to put the district court on notice. But more... That, in fact, he knew that they were disputing this, but I... But that was an objection to the role enhancement, I thought. Both. He said that it was double counting. He talked about the role. And I'm saying that the role here actually does fit into the analysis. So I'm not suggesting that it's... But the abuse of trust issue was not squarely presented. Do you agree with that? Yes. I cannot disagree because the sentencing memo mentions role. But I do also say that it is plain error, and in fact, the court makes no findings at all.  It is not sufficient for the court to simply say, I'm agreeing that it's level 43, then saying, well, that's only for incarceratory purposes. I'm not sure what that means from the court's point of view. It's a little ambiguity there. But I also think that we know from our own case law that regardless of whether you're giving a variance, there has to be some finding. He didn't make any findings of the enhancements. And he didn't make... He didn't make any findings of the pre-sentence report, did he not? Well, it's not even that he say, I'm not adopting it, then finds level 43, then says it's not for incarceratory... Only for incarceratory purposes, and then says, but I don't have to, regardless, I don't have to. With respect to the loss amount, the judge makes very clear that he didn't care about the loss amount. But he otherwise, it seemed to me, adopted the pre-sentence report. Am I wrong about that? No, he does. But he's just... Because he says, but for the loss amount, and then says the statements are just not clear. And I think that that hinders this court's analysis of the correctness. And even the loss, I would say, it was important. You cannot just say that there, I'm going to give a variance. And I understand that an exactitude isn't necessary. But in this case, I think that it would. But because if we look at the difference, for example, a finding, let's say that the court said, well, you know what? Maybe it was only 3 million, but I'm not going to find because of the discrepancy. But the scope is different. And I suggest if it was a much lower amount of loss, which I think that because he relied on unreliable information, which I explained in my brief, that it could have been much lower, that I believe it would make sense, based on his comments in sentencing, that the sentence would be lower. And it is significant, the distinction in even two points when you go back. Because he gave about a 6 to 7 point variance. If you go back two points less, and then do a 6 to 7 point variance, what you get... Right. But the judge explicitly said, the loss amount does not matter to me. That is not what is important in this sentencing, right? That the distinction that was being argued to him as to what the amount really was as opposed to what the government said it was, is something that he said, well, that doesn't really... My sentence would be the same regardless of that. I'm not paying attention to that. So why would we think that he would actually pay attention to it in such a way that if the guideline numbers were lower, he would have given a lower sentence than he did? Because in fact, it's unreliable, violate his due process rights, my client's due process rights. The charts upon which he relied is what the PSR relied, and therefore he relied, were completely unreliable. They were unreliable for restitution, and they were unreliable for loss, remembering that they weren't... Can I ask a question about the restitution? Sure. Absolutely. There's a reference in the record to a document, Court Exhibit 1, that lists identifiable victims and presumably amounts of loss. I could not find that in the appellate record or anywhere. Is that something that you have access to or have had access to? Do you know what's on that? Yes, I received that this week. I noticed it was not, to my error, in the appendix, but I would like to thank the government for supplying that to me this week, and I did receive it. And even that shows, I would suggest, the unreliability of... I'm not asking about the reliability. I'm asking about the restitution issue here. It is my understanding that restitution may only be awarded to identified victims in the amount of identified losses. It seems to me entirely appropriate for the judge to say, to calculate the overall loss for the scheme for purposes of the guidelines in deciding what is the magnitude of the crime, but that's different than awarding restitution. And what I'm wondering is, does Court Exhibit 1 show any amount approaching the $11 million of restitution, or does it show only 150 victims with some numbers that add up to something else? Well, that's the problem there. And when I got that this week, it shows an excess of $16 million, so I would like to know... And you're not harmed. I mean, the whole problem with this, let's take it back to the very beginning, is there was no objection to the restitution order. So you're on plain error analysis, which you have a heavy burden. You did not even reference this exhibit, which is alluded to in the sentencing, in the restitution order. So, you know, I just don't see how you've carried your burden. You're telling us the court issued restitution without having victims in that amount. We know from the restitution order that it had a list of victims in amounts. You didn't supply it with us, and you're not challenging it. Now you're telling us, you know what the problem is? The court ordered $11 million in restitution on a document that supports $16 million in restitution. I mean, we are very, very far removed from plain error as I see it on the record you've given us. Okay. Well, Your Honor, the fact of the matter is that he did below argue that restitution wasn't appropriate and argued it in due process grants when he talked about the victims in the sentencing memo. I'm talking about he being the trial court attorney. But in addition, it has to be questioned if the court's relying on court exhibit one or two. I'm not sure which one, but you're right. If it's relying on that and it's finding a restitution amount of close to $12 million where the court exhibit says $16 million, I suggest to Your Honor that that further supports my argument that what the court was relying on just didn't make sense. It didn't make sense because we have, again, the 30,000 victims when it couldn't have been 30,000 victims as we know from the sworn testimony of the government's own witnesses. They don't, and even her charge. So what we have is contradictory evidence over and over again that is inconsistent both internally and to the sworn testimony. You- I know you want to reserve time, so let's hear- Oh, thank you very much. I'm going to be brief on these points, okay? Good morning. May it please the court, Edward Imperatore for the government. I've represented the government below in the district court both at trial and at sentencing and in this court on appeal. The judgment of the district court should be affirmed in all respects. The district court, Judge Keenan, properly calculated the loss amount and held in the loss amount was immaterial to his sentence in any event. The district court also properly applied enhancements for breach of trust, sophisticated means and role, and properly held the defendant jointly and severally liable for restitution in the amount of $11.9 million. May I ask a question about the sophisticated means? Under the guideline, it's quite explicit that the enhancement applies, A, if there are sophisticated means and, B, if the defendant himself intentionally engaged in or caused the sophisticated means. So what is the sophisticated part of what Fiumano did? Your Honor, as this court has held, the sophisticated means can be looked at in the aggregate and need not be sophisticated one at a time, but Fiumano himself engaged in a number of sophisticated means which are closely parallel. They can be aggregated, but they have to be aggregated as to him, right? Yes, Your Honor, but he participated in each facet of the sophisticated means. First of all, Fiumano orchestrated something that was called the company flip. It was the use of shell companies, fictitious companies, in order to disguise the company's existence, and that was done as a cooperator testified in order to evade law enforcement. Fiumano was the one who decided when to do the company flip and what to change the fictitious company name to. So the guidelines themselves identify that factor. That might be enough by itself, at least in the securities context. It is, Your Honor, and that is the defendant himself who is doing that. In addition to that, there are other sophisticated means. He, of course, is the one who is scripting the misrepresentations of the customers. As the guidelines has recognized, when the call center is located in a place that is That's an example in the guideline commentary. It is, Judge Raggi, and here it's the defendant who is orchestrating those misrepresentations being made in a remote . . . Well, wait. He's not orchestrating the remote location. It was already set up that way when he joined this company. It was, Your Honor, but he is the one who is authoring the misrepresentations that are being made from the remote . . . Would that mean that every salesperson is also engaged in sophisticated means because he's working in a call center that is in a different place than the law firm? Well, not necessarily, but here it's . . . he's the one who is actually scripting . . . Yeah, but he's scripting the misrepresentations. He's not scripting or . . . it's unclear to me what he has to do with the by location issue. Well, he had . . . Other than he knows that he's in one location. Well, he had explicit discussions with a cooperating witness about the setup of the remote locations, about the need to have them remotely as a buffer. As Your Honor will recall, he and Abgari, the cooperating witness, worked together at a company called Clear Blue, and the model was changed in order to evade law enforcement. He also had discussions in New York with the quote-unquote law firm about the necessity of maintaining this model. Can I ask a question about the cooperators? Yes. Part of the substantive unreasonableness argument here is that Mr. Fiumano, who's a . . . let's even say a high-level manager in this operation, gets 16 years. The two people, Abgari and Linderman, who owned this, took much more of the money, created this scheme, and recruited him to join it, got much lower sentences because they cooperated. Did they cooperate against somebody other than him? They did. Other people below them in the scheme, or is there some . . . you know, I don't think it's appropriate for me to ask you, like, give me names that we cooperated against, but is there some . . . the sense that one gets from this trial, which may be misleading, is that these folks are all cooperating down, essentially, and implicating . . . testifying against Fiumano in this case, and describing what the other salesmen did. I don't know whether they were indicted or charged. Well, that's not entirely accurate, Your Honor. So first of all, with respect to Linderman, he was the first cooperator signed up. The government charged the case largely on the basis of his information. His information was used to charge Abgari, Romano, and Fiumano, so three co-conspirators. Abgari cooperated after he was charged. His information helped the government charge someone named Christian Mahasis, who was another co-conspirator who ultimately cooperated, and also to charge Abgari. But at a factual level, it would not be correct to say that both Linderman and Abgari enjoyed the lion's share of the proceeds. The testimony that came in, actually, was that Fiumano was the highest earning person in the scheme. He was recruited and was the only member of the scheme who had earned income based on the total volume of sales. So the testimony of Abgari was actually . . . I heard his income was something like a half million dollars. It was, Your Honor. It was roughly . . . Half a million dollars. It was, I mean, it was spent on . . . I mean, this was a large quote-unquote sales force. It was spent on commissions of other people. Everybody else gets paid. Everyone else gets paid, and there was also marketing expenses, which were part and parcel. The defendant here got paid the most. That's correct, Your Honor. That was the evidence that came in at trial. I also want to just briefly address this issue . . . Not very good businessmen, Abgari and Linderman, it sounds like.  Yes. I take it they did not, as part of their cooperation, fork over very much of the $11.9 million that is owed to the victims. That's correct, Judge Lynch. I don't know that any money has been recovered. But pivoting to restitution, I want to just set the record straight on Court Exhibit 1 because there was a misrepresentation in the defendant's brief about this. The government brought copies of Court Exhibit 1, and I'm happy to hand them up if it's helpful. This is roughly 150 single-space pages. There are roughly 10,000 names on this list. So it's not 150 victims? Not 150. It's roughly 10,000, all with addresses, zip codes, and individual dollar amounts totaling roughly $16 million. And you agree the plain error analysis exists here in any event? Yes, Judge Loya, it does, because these issues were never raised before Judge Keenan. All right. So how do you explain . . . Ms. Newman thinks that now because the dollar amount is higher than the restitution order, that that should give us pause about the restitution order. So tell us your response to that. Well, clearly the defense, Judge Radji, can't have it both ways. How did the court get from $16 million to $11 million? Sure. So this has to do with the money flow and the different types of records that were relied upon. So the restitution records were drawn from what are called payment processor accounts. There are these intermediaries between the company and the bank that take the customer's information and typically bill their credit card. That information contains the customer's names, addresses, and dollar amounts. That was the basis for the restitution. With respect to the money flow, and this is a point we've made in our brief, the loss amount is actually a quite conservative figure because it already slices off the top money that's being retained by the New York Law Office. So the flow of the money is this. The victims pay the New York Law Office millions of dollars. Of that amount, roughly $11.9 million is diverted to California, to the so-called marketing company, to pay their expenses. That $11.9 million is the basis of the restitution. Judge Keenan clearly, as I think Judge Raggi highlighted, could have awarded more in restitution. This was a conservative figure. But I think that the salient . . . Judge Keenan is allowed to play the Powerball Lottery during the 16 years that he spends in prison, and is successful in doing so. This is a rather academic exercise, I suppose, in any event. It is, Your Honor. And of course, Judge Lynch, it is plain error review for the reasons the Court's questions have highlighted. Just briefly on breach of trust, as Judge Lynch's questions highlighted, this is a plain error standard. These arguments were never made to the district court. On a preponderance standard, the evidence amply supported the application of the enhancement. The Fourth Circuit case, United States v. Moore, on which the defendant relies, is easily distinguishable, because in that case, the misrepresentations that were the foundation of the breach of trust enhancement were entirely those of a co-conspirator, and the Fourth Circuit also held that the enhancement didn't take into account relative culpability. Here by contrast, not only is the defendant directing his co-conspirators to make these statements, he's literally scripting them. And of course, to accept the defendant's argument would lead to the absurd result that someone like the defendant, who is in a high level of culpability, could somehow insulate himself from the application of this enhancement, simply by having a minion utter the words into the phone. That makes no sense, and it's inconsistent with this Court's precedent in cases like Wright and Hussey and others. And there's also a Tenth Circuit case, which is factually analogous here, United States v. Queen, which is 4F3D, 925, Tenth Circuit, 1993. Unless the Court has any further questions, the government will rest on its submission. Could you hand up the Exhibit 1? Thank you. Thank you very much, Your Honor. First of all, the evidence, I would suggest, is not exactly as the government has proposed. The evidence as to the amount of salaries is something I bring up in my brief for the Court to scratch their heads at and say, do you mean to say that Abaghari and Lindemann earned nothing? Because that's what the charts suggest. It was not the testimony that Fiammano earned the most. Rather, the testimony was that Rieland didn't look for the salary of Lindemann and Abaghari or Malhasis or anybody else. And in fact, there was testimony from Justin Romano that he earned in one year, from his $1,200,000. That's just for 2012, and there is nowhere in the Rieland charts that we can account for that or the $200,000 that Justin Romano says that he stole from the Alicorn law firm during this period for this activity. So the Rieland charts, which upon the Court relied for loss and restitution alone, have to cause somebody to put— The bottom line is that these people were operating a scheme that sold people things that they had no need of, that provided them essentially no services, and charged them large amounts of money for it based on representations, misrepresentations. I'm having a little trouble understanding why every dollar that came into this operation was not appropriately considered a loss. Well, because I disagree with the analysis, and respectfully, that it's didn't—they didn't need for. I don't really need a travel agent, do I? And maybe some people would say, I don't need an attorney to file a will, right, to draft the will, a simple will. I can do that myself. But in fact, people pay a lot of money for services that arguably they don't need. But the courts have recognized that in a context like this, where you're basically giving someone something on fraudulent representations, that the assumption is that the entire transaction is fraudulent. Well, Your Honor, when we begin with the doc prep— We say that in United States v. Binday, which is only two years ago, that the misrepresentation to induce a victim to enter into the transaction without relevant facts to make an economic decision results in the victim sustaining a loss. So, I mean, that's—you know, we're not—we're concerned here with the fact that your client obtained money from these people on these false representations. I understand that there were false representations, but with respect to the doc prep, the evidence is that they were told they don't need an attorney, which—and that they can do it themselves. And what they got was a pile—they compiled all the documents with the forms. Yes, they could have done it online, but I don't think that that's material to whether or not that's part of a fraud, because doing it yourself for the preparation. I also want to point out something about clear blue, because the government relies upon this—the fraud in clear blue. But there is no evidence that my client was involved in fraud in clear blue. In fact, Abagari says that he never heard my client make any false representation. And when Abagari says they—with Lindemann, they created the firm, they created it to avoid the problems that existed. There is not one statement, not one testimony from Abagari that he did it to evade law enforcement. That's the government's interpretation of his testimony, which is easily, just as easily to say, we did this to avoid the problems of not having an attorney, so we created a marketing firm. I get to look at this, as the district court did, in the light most favorable to the government now. And as you've said, that testimony is subject to understanding that basically it was when that Fiumano worked for Abagari at clear blue. They were running a fraudulent scheme, and when Abagari left clear blue to start PMG, he selected Fiumano to run clear blue's sales staff. Yes, but that doesn't mean that Fiumani came in in November of 2011 and doesn't go to the New York firm until February of 2012, that he was aware when he entered the firm that they were doing some fraudulent—because there's not one piece of testimony from Abagari or Mohassas—Lindemann doesn't testify—of anything of the nature. I just want to spend one second on disparity, because Your Honor brought that up. There's one thing about cooperation and getting a lower sentence. We all understand that that's not in dispute, but there's a major difference here when my client gets 16 years, which is six times higher than the owner of the firm. The firm— He cooperated. He does— And did not go to trial. I mean, these things are—we see this repeatedly in cases, and this is a matter of whether we think the district court exceeded its discretion, not whether we would have done the same thing ourselves. That's correct, but Your Honor, six times higher, I would suggest, has the chilling effect on the exercise of the Sixth Amendment right to trial, because it's not only—remember, Mohassas does not testify, and Lindemann gets, I think, 24 months. So 16 years, 24 months, it's true he may have, you know, cooperated for it and others. I'm not looking—what I'm saying is I'm not looking at Lindemann's sentence. I'm not looking at Abagari's sentence or Mohassas, who gets probation. What I'm saying is that when you get a sentence of 16 years as compared to probation, 24 months, 31 months, you have a disparity here that's so great that the meaning within the guidelines, the statute, which has to be considered, is meaningless because of the disparity. Thank you very much.